# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

PATRICK BOLLOM and
COLLEEN BOLLOM,

          Plaintiffs,

v.

BRUNSWICK CORPORATION,
a foreign corporation transacting
business in the State of Minnesota
d/b/a Sea Ray Boats, and
MARINEMAX, INC., a foreign corporation,

          Defendants.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 18-3105 (MJD/HB)

Todd E. Gadtke, Gadtke Law Firm, P.A., Counsel for Plaintiff.

Anthony W. Finnell, Jr., and Daniel J. Connolly, Faegre Drinker Biddle & Reath LLP, Counsel for Defendants.

## I.    INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary

Judgment [Docket No. 27], Defendants' Motion to Exclude the Testimony of

Plaintiffs' Expert David Hallman [Docket No. 32], and Defendants' Motion to

Exclude Testimony of Plaintiffs' Valuation Expert David Lynch [Docket No. 36].

## II.    BACKGROUND

### A.    Factual Background

On October 21, 2015, Plaintiffs Patrick Bollom and Colleen Bollom

purchased a new 2015 Sea Ray Venture 370 Sport Cruiser ("Vessel") from

Defendant MarineMax, Inc. ("MarineMax"), which, with taxes and fees, totaled

$358,646.25.  (Finnell Decl., Ex. M, Purchase Agreement.)  The Vessel was

manufactured by Defendant Sea Ray Boats, a division of Brunswick Corporation

("Sea Ray").  (Id.; Finnell Decl., Ex. M, Sea Ray Limited Warranty.)

### 1.    Purchase Agreement Between Plaintiffs and MarineMax

The Purchase Agreement between MarineMax and Plaintiffs is a one-page

document with text on the front and back.  A "DISCLAIMER OF

WARRANTIES" appears on the front and again on the back of the Purchase

Agreement, which states, in bold capital letters:

> THE BOAT, MOTOR AND ACCESSORIES BEING PURCHASED
> PURSUANT TO THIS AGREEMENT ARE SOLD BY SELLER 'AS IS'
> AND SELLER MAKES NO WARRANTIES ON ITS OWN BEHALF,
> EXPRESS OR IMPLIED, INCLUDING THE IMPLIED
> WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A
> PARTICULAR PURPOSE . . . .

The Purchase Agreement provides that it shall be "GOVERNED BY THE

LAWS OF THE STATE IN WHICH SELLER'S LOCATION DESIGNATED ON

THE FRONT SIDE OF THIS ORDER IS SITUATED." (Purchase Agreement ¶

10.) The location on the front side of the Purchase Agreement is Minnesota.

## 2. Sea Ray Limited Warranty

The Vessel also came with Sea Ray's Sport Cruiser Limited Warranty

("Limited Warranty"). (Finnell Decl., Ex. M.) The Limited Warranty provides:

> [Sea Ray] warrants to the original retail owners of its Sport Cruisers .
> . . that the selling dealer will repair or replace, at its sole discretion,
> any defects in material or workmanship in the Sea Ray Boat that are
> reported within the applicable warranty periods set out below,
> subject to the remedies, exclusions, and limitations in this limited
> warranty.

(Limited Warranty at 1.)

It further provides:

### SOLE REMEDY

> THE REMEDY OF REPAIR OR REPLACEMENT OF PARTS OR
> MATERIALS THAT ARE FOUND TO BE DEFECTIVE IN
> FACTORY MATERIALS OR WORKMANSHIP COVERED BY THIS
> LIMITED WARRANTY SHALL CONSTITUTE THE OWNER'S
> SOLE AND EXCLUSIVE REMEDY AGAINST SEA RAY FOR ANY
> CLAIMS WHATSOEVER OF ECONOMIC LOSS RESULTING
> FROM PRODUCT FAILURE.

(Id.)

The Limited Warranty also states:

### OTHER LIMITATIONS

EXCEPT AS SET FORTH HEREIN OR ON ANY OTHER WRITTEN
EXPRESS LIMITED WARRANTIES BY SEA RAY, THERE ARE NO
OTHER WARRANTIES EITHER EXPRESS OR IMPLIED
PROVIDED BY SEA RAY ON THIS BOAT.  ALL OTHER
WARRANTIES, EXPRESS OR IMPLIED, INCLUDING IMPLIED
WARRANTIES OF FITNESS AND MERCHANTABILITY, ARE
EXPRESSLY EXCLUDED.  . . .

ANY IMPLIED WARRANTY OF MERCHANTABILITY OR
FITNESS FOR A PARTICULAR PURPOSE IS DISCLAIMED.  TO
THE EXTENT THE IMPLIED WARRANTY CANNOT BE
DISCLAIMED, IT IS LIMITED TO THE SHORTER OF ONE YEAR
FROM THE DATE OF DELIVERY TO THE FIRST RETAIL OWNER
OR THE DURATION OF THE RESPECTIVE EXPRESS LIMITED
WARRANTIES STATED HEREIN.  TO THE EXTENT ALLOWED
BY LAW, NEITHER SEA RAY NOR THE SELLING DEALER
SHALL HAVE ANY RESPONSIBILITY FOR LOSS OF USE OF THE
BOAT, LOSS OF TIME, INCONVENIENCE, COMMERCIAL LOSS
OR CONSEQUENTIAL DAMAGES.

(Id. at 2.)

The Limited Warranty also provides:

## STATUTE OF LIMITATIONS

Any action for rescission or revocation against Sea Ray shall be
barred unless it is commenced within one (1) year from the date of
accrual of such cause of action.  This provision does not grant any
consumer a right of rescission or revocation against Sea Ray, where
such right does not otherwise exist under applicable law.  . . .

### 3.    2016 Boating Season

Plaintiffs took delivery of the Vessel on May 25, 2016.  (Finnell Decl., Ex. N.)

Plaintiffs assert that, in the three years after taking delivery of the Vessel, they have experienced a variety of problems with it.  (Gadtke Decl., Ex. C, Punch List.)  During the 2016 summer boating season, the Vessel experienced issues such as: no running water in the sinks and toilet, warning notice flashing when the engine was started, the electric boat anchor was inoperable, the water temperature gauge did not work, the carbon monoxide detector was beeping intermittently, the helm controls (depth finder, marine radio) failed, the starboard fuel gauge did not work, and the speedometer failed.  (Id.)  Plaintiffs also claim that, twice, the Vessel lost power to the cockpit and the generator would not start so the batteries could not be charged.  (Id.; Gadtke Decl., Ex. D, Aug. 29, 2016 Email from C. Bollom.)  Each issue was repaired by MarineMax and was marked as operational on Colleen Bollom's punch list.  (Gadtke Decl., Ex. C, Punch List; Gadtke Decl., Ex. G.)

On July 5, 2016, Patrick Bollom emailed MarineMax regarding issues with the Vessel.  In the email, he stated:

[N]ow that we've had the boat for 5 outings we're wondering if we got a "lemon."  Did we get a "deal" on the boat due to all of the problems?  Not to mention the 5 poorly repaired cracks in the starboard front deck make me wonder if there was an accident of some kind that triggered all of these issues.  As opposed to throwing "good money" after sunk costs – should we look at how Searay/MarineMax and the Bolloms can each walk away from what appears to be a bad boat?  Think it over and let me know.

(Gadtke Decl., Ex. F, July 5, 2016 Email.)

On August 11, 2016, Patrick Bollom emailed Sea Ray and stated, in part:

I'll assume at this point that the boat we bought is a "lemon."  Maybe it was dropped, maybe it was a "Monday" boat after a big game.  Not sure.  But it's a disaster.  We haven't had an issue-less outing yet.  The punch-list of repairs is still a healthy document, and the fixed stuff seems to break again the next week.  We're assuming we're on a limited time-frame to declare it a lemon as it will go off warranty and we'll never have had a working boat.

* * *

How can we get a working boat?  What should we do?  What is the process to "stop the bleeding?"

(Gadtke Decl., Ex. J, Aug. 11, 2016 Email.)

At the end of the first boating season, Patrick Bollom told Defendants to take the "lemon" back and that Plaintiffs didn't want it because it didn't work.

(Gadtke Decl., Ex., B, P. Bollom Dep. 64-65.)  Defendants said it would be working by July 2017.  (Id. 64-65, 104-05; Gadtke Decl., Ex. K, Letter from

Plaintiffs to Sea Ray.)  Defendants also extended the Sea Ray one-year Limited

Warranty by one more year.  (P. Bollom Dep. 90; Gadtke Decl., Ex. K.)  Patrick

Bollom considered returning the Vessel but decided to keep the Vessel because

Plaintiffs thought that Defendants could fix it and Defendants "strung us along

that they could."  (P. Bollom Dep. 100.)

### 4. 2017 Boating Season

Plaintiffs assert that, during the second boating season, in 2017, the Vessel

experienced additional issues, including: the port side fuel sensor failed, the

generator had several errors after repairs had been attempted to it, the outboard

engines stopped running while attempting to tie up the Vessel, the house battery

failed, and the cockpit lights would intermittently turn on although they were in

the off position.  (Gadtke Decl., Ex. C, Punch List.)  All of these issues were

addressed.  (Id.)

During July 2017, Patrick Bollom emailed MarineMax that Plaintiffs were

done with the Vessel and wanted to return it.  (Finnell Decl., Ex. P at P1001290,

July 5, 2017 Email from Patrick Bollom to MarineMax ("We are returning the

boat.  Please don't fix it for us.  We're hoping to hear from Chris in the next 24

hours what the return process is."); id. at P1001425, July 6, 2017 Email from

Patrick Bollom to MarineMax ("We don't want to waste another summer or two fixing your boat.  Let's get this returned and get a different boat."); id. at P1001294-95, July 10, 2017 Email from Patrick Bollom to MarineMax ("We're done with the boat.  We have no confidence in the boat or it[]s ability to provide 2 consecutive days of safe enjoyable boating. . . .  We want out of this thing.").)

During the 2017 boating season, Patrick Bollom met with MarineMax and told them that they "can take your boat back.  Why don't you just cut me a check right now.  This boat is yours."  (Gadtke Decl., Ex. B, P. Bollom Dep. 63.) MarineMax offered to take the Vessel on trade and sell Plaintiffs another boat, so long as Plaintiffs "don't say anything to anybody" about the Vessel's problems. (Id. 64-65.  See also Gadtke Decl., Ex. I, C. Bollom Dep. 59-60.)  Plaintiffs did not agree to those terms, so, instead, they agreed to Defendants' offer to attempt to repair the Vessel again.  (C. Bollom Dep. 60.)

On November 21, 2017, Plaintiffs, through their attorney, sent a letter to MarineMax and Sea Ray giving notice that Defendants had breached their express warranties and the Magnuson-Moss Warranty Act and requesting a full inspection of the Vessel by May 15, 2018 and free repairs of all issues within three weeks of the inspection.  (Gadtke Decl., Ex. L, Nov. 21, 2017 Gadtke Letter.)

### 5. 2018 Boating Season

During the third boating season, in 2018: the speedometer failed again after Defendants attempted repairs to it, and it still does not work; the generator continued to have problems; the electric anchor again failed to work after Defendants attempted repairs to it; the carbon monoxide detector failed again; the GPS system was not working, and the port side fuel gauge was not working. (Gadtke Decl., Ex. B., P. Bollom Dep. 80-81, 86-87; Gadtke Decl., Ex. C, Punch List.)

Plaintiffs claim that, during a typical boating season, they would take approximately 30 excursions on their boats. (Gadtke Decl., Ex. B, P. Bollom Dep. 62.) Due to the issues with and repairs to the Vessel, they only were able to use the Vessel for approximately 16 excursions per boating season. (Id.) The Vessel was inoperable during two of the three July 4 holidays. (Id. 63; C. Bollom Dep. 42-43.) They only took the Vessel on "simple trips" to "where somebody could tow us back" (P. Bollom Dep. 82), and Colleen Bollom was afraid to take the Vessel out with her friends or children without her husband (C. Bollom Dep. 61).

### B. Procedural History

On October 5, 2018, Plaintiffs commenced an action in Minnesota state court against Sea Ray and MarineMax by serving MarineMax with the summons

and Complaint.  The matter was removed to this Court on November 5, 2018

based on diversity and federal question jurisdiction.  [Docket No. 1]

The Complaint alleges: Count 1: Violation of 15 U.S.C. § 2301, <u>et. seq.</u>,

Magnuson-Moss Warranty Act (Sea Ray and MarineMax); Count 2: Breach of

Express Warranty, Violation of Minn. Stat. §§ 336.2-607 and 336.2-714 (Sea Ray);

Count 3: Breach of Implied Warranty of Merchantability, Violation of Minn. Stat.

§ 336.2-314 (Sea Ray and MarineMax); and Count 4: Revocation of Acceptance,

Violation of Minn. Stat. § 336.2-608 (Sea Ray and MarineMax).

Defendants now move to exclude two experts and for summary judgment

on all claims against them.

## III.  DISCUSSION

### A.  **<u>Daubert</u> Motions**

#### 1.  **<u>Daubert</u> Standard**

The admissibility of expert testimony is governed by Federal Rule of

Evidence 702.  The proponent of the testimony has the burden to show by a

preponderance of the evidence that the testimony is admissible under Rule 702.

<u>Lauzon v. Senco Prods., Inc.</u>, 270 F.3d 681, 686 (8th Cir. 2001).  Under the Rule:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Under the framework developed in <u>Daubert</u>, trial courts must serve as gatekeepers to insure that proffered expert testimony is both relevant and reliable.  Trial courts are given broad discretion in fulfilling this gatekeeping role . . . ."  <u>Wagner v. Hesston Corp.</u>, 450 F.3d 756, 758 (8th Cir. 2006) (citations omitted).  The proposed testimony must be useful to the factfinder; the expert witness must be qualified; and the proposed evidence must be reliable.  <u>Lauzon</u>, 270 F.3d at 686.  "[D]oubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility."  <u>Miles v. Gen. Motors Corp.</u>, 262 F.3d 720, 724 (8th Cir. 2001) (citation omitted).

In determining the reliability and relevance of the proffered testimony, the Court examines factors such as

whether the theory or technique is subject to testing, whether it has
been tested, whether it has been subjected to peer review and
publication, whether there is a high known or potential rate of error
associated with it, and whether it is generally accepted within the
relevant community.

Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005) (citation omitted).

Subsequent cases have proposed additional factors, including,
whether the expertise was developed for litigation or naturally
flowed from the expert's research; whether the proposed expert
ruled out other alternative explanations; and whether the proposed
expert sufficiently connected the proposed testimony with the facts
of the case.

Polski v. Quigley Corp., 538 F.3d 836, 839 (8th Cir. 2008) (citation omitted).

However, "[t]his evidentiary inquiry is meant to be flexible and fact specific, and

a court should use, adapt, or reject Daubert factors as the particular case

demands. There is no single requirement for admissibility as long as the proffer

indicates that the expert evidence is reliable and relevant." Unrein, 394 F.3d at

1011 (citation omitted).

If a party believes that an expert opinion has not considered all of
the relevant facts, an objection to its admission is appropriate. Even
a theory that might meet certain Daubert factors, such as peer
review and publication, testing, known or potential error rate, and
general acceptance, should not be admitted if it does not apply to
the specific facts of the case.

Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056 (8th Cir. 2000)

(citations and footnote omitted).  However,

> [a]s a general rule, the factual basis of an expert opinion goes to the
> credibility of the testimony, not the admissibility, and it is up to the
> opposing party to examine the factual basis for the opinion in cross-
> examination.  Only if the expert's opinion is so fundamentally
> unsupported that it can offer no assistance to the jury must such
> testimony be excluded.

Bonner v. ISP Techs., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001) (citation omitted).

### 2. Expert David Hallman

#### a) Background

Plaintiffs offer expert David Hallman, M.S., P.E., who is a materials and

mechanical engineer, auto mechanic, and fire investigator.  (Finnell Decl., Ex. J,

Hallman Report at 3.)  He has a Masters in Materials Science and Engineering; is

a licensed professional engineer in multiple states, including Minnesota; is a

National Institute for Automotive Service Excellence ("ASE") Certified Master

Automotive Technician with 10 years professional experience as an auto

mechanic; and is a National Association of Fire Investigators certified vehicle fire

investigator.  (Id.)  ASE certifications include a certification in 12 Volt DC

electrical systems.  (Id.)  Hallman has more than 25 years of experience in

materials research, mechanical engineering and design, crash testing research

and crash investigation and reconstruction, vehicle fire research and investigation, automotive mechanics, and forensic mechanical and materials investigation.  (Id.)

Hallman inspected the Vessel and reviewed its repair history.  (Hallman Report at 3.)  Hallman opines that the Vessel's house batteries rapidly discharge during limited use; "[m]ultiple electrical component issues in a 12VDC electrical system tend to be indicative of an overall system issue;" "[i]t is not uncommon for multiple electrical system issues to be caused by loose or high resistance ground connections or other grounding connection issues;" grounding issues or high resistance connections could be causing Plaintiffs' batteries to rapidly discharge; the Vessel contains an "apparent underlying systematic electrical problem;" and unless the systemwide issues are fixed, the Vessel will likely continue to have multiple electrical problems.  (Id. at 4).

Hallman testified that he did not identify or look for any grounding issues or high resistance connections, nor did he test for or identify a systemwide electrical problem in the Vessel, because he did not want to do destructive testing.  (Finnell Decl., Ex. C, Hallman Dep. 33-34; 40-41; 51).  Thus, he "believe[s]" that there is a systemwide issue but he does "not know what it is."

(Id. 40.)  Hallman also testified that, although he thinks it is poor design to wire the generator starter to the house batteries, as on the Vessel, most of the boats he's seen contain electrical systems that are designed in the same manner. (Id. 84).

### b)    Admissibility of Hallman's Opinion

While Hallman is clearly qualified as an expert regarding fire origins, materials research, accident reconstruction, and mechanics, he is not qualified to opine regarding the design and functioning of a boat's electrical system because he has no expertise in that area.  In particular, Hallman's opinion that the Vessel contains an "apparent underlying systematic electrical problem" is inadmissible.

Hallman's extensive publication, educational, and research experience encompasses only accident reconstruction, materials, and fire investigation. There is no indication of any experience with electrical systems or diagnosing electrical issues at all, let alone in boats.  The work and investigation experience that he lists in his CV relates to crashes, fires, and mechanical and materials failures, but there is no mention of electrical systems.  He is not an electrical engineer or electrician.  Although Hallman has worked alongside electrical engineers, those experiences do not provide relevant experience for his current

opinion.  He testified that, on those occasions, each engineer confined their contribution to their discrete discipline, and his contributions remained restricted to mechanical or materials engineering; electrical issues were left to the electrical engineers.  (Finnell Decl., Ex. C, Hallman Dep. 10-11.)

Although Hallman has expertise in various areas – such as crash investigation and fire cause investigations – he has no expertise or experience with marine electrical systems or electrical systems in general.  "[F]or an expert witness to be qualified based on experience, that experience must bear a close relationship to the expert's opinion."  Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009).  Thus, for example, a fire investigator's experience opining on "fire cause and origin" does not qualify him as an electrical expert able to testify regarding whether a particular electrical system malfunctioned and caused the fire.  See Weisgram v. Marley Co., 169 F.3d 514, 518 (8th Cir. 1999), aff'd 528 U.S. 440 (2000).  Here, Plaintiffs fail to explain how Hallman's experience as a fire investigator translates to being an expert in electrical systems.

Because Hallman is not qualified to opine regarding electrical issues in the Vessel, Defendants' motion to exclude is granted. The Court further notes that Hallman's lack of qualification is compounded by the failure to test his

hypothesis. "Rule 702 mandates that the district court . . . must conclude, pursuant to Rule 104(a), that the proposed testimony is scientific knowledge, derived from the scientific method." Johnson v. Mead Johnson & Co., LLC, 754 F.3d 557, 561–62 (8th Cir. 2014).

Hallman claims that there are high resistance connections, grounding issues, and a systemwide electric issue, but he did not test for any of those issues. (Finnell Decl., Ex. E, Hallman Dep. 33-35, 40-41.)  He failed to inspect the house batteries, even though he admits that they were the only source of power used by the components during his tests, bad batteries could cause the problems that the Vessel experienced, and he could have tested them without destructive testing (Finnell Decl., Ex. J, Hallman Report at 6; Hallman Dep. 25, 41, 51, 60-61, 88); he failed to test the components at maximum use (Hallman Dep. 23-25, 30, 34-36, 58-59); and he found no rapid discharge of the house batteries during his inspection (id. 51).  He performed no tests on the AC system, only the DC system, even though Plaintiffs reported issues with AC components.  (Finnell Decl., Ex. W, Hallman Dep. 42.)

Thus, Hallman's opinion is not based on testing but rather, on his claim that "[m]ultiple electrical issues in a vehicle, particularly a vehicle which

contains both AC and DC electrical systems required to work together like a boat or a recreational vehicle, tend to be indicative of a system issue;" his general opinion that "[i]t is not uncommon for multiple electrical system issues to be caused by ground side problems [] in a 12 VDC system;" and "[g]rounding issues or high resistance connections could also be partially to blame for the rapid discharge of the house batteries during limited electrical equipment operation." (Hallman Report at 8-9.) These bases for his opinion are particularly insufficient when he lacks expertise in the area of electrical systems. In sum, Hallman's theories are "so fundamentally unsupported that [they] can offer no assistance to the jury." Bonner v. ISP Technologies, Inc., 259 F.3d 924, 929-30 (8th Cir. 2001).

### 3. Expert David Lynch

#### a) Background

Plaintiffs also offer the opinion of expert opinion of David Lynch, a Senior Broker at Yacht Brokers Inc., in Afton, Minnesota. (Finnell Decl., Ex. K, Lynch Report at 1.) Lynch opines that (1) if the alleged operational issues in Plaintiffs' vessel continue to be unresolved, the vessel becomes almost unsellable; and (2) based on David Hallman's conclusion that an unidentified electrical system issue

exists, the vessel would be difficult to sell.  (Id.)  He further opines that, based on

the information he had reviewed from Plaintiffs, he could not establish a current

valuation of the Vessel.  (Id.)

### b)      Admissibility of Lynch's Opinion

Defendants move to exclude Lynch's testimony on the grounds that 1)

Plaintiffs failed to disclose Lynch as an expert until three months after the

disclosure deadline and 30 days after expert discovery closed; 2) Lynch's report

is unsigned and incomplete; and 3) Lynch's report provides no indication of

what methodology he used to develop his opinion that the vessel would be very

difficult to sell.  Plaintiffs have filed a letter stating that they do not oppose

Defendants' motion to exclude Lynch's testimony.  [Docket No. 43]  Therefore,

the Court grants Defendants' unopposed motion to exclude the testimony of

David Lynch.

### B.      Summary Judgment Motion

### 1.      Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  <u>Amini v. City of Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

### 2.      Count 2: Breach of Express Warranty

To establish a breach of warranty claim, a plaintiff must prove: "the existence of a warranty, a breach, and a causal link between the breach and the alleged harm."  <u>Peterson v. Bendix Home Sys., Inc.</u>, 318 N.W.2d 50, 52–53 (Minn. 1982).  Count 2 is asserted against Sea Ray only.

### a)      Breach

Sea Ray's Limited Warranty states:

**SOLE REMEDY**

THE REMEDY OF REPAIR OR REPLACEMENT OF PARTS OR MATERIALS THAT ARE FOUND TO BE DEFECTIVE IN FACTORY MATERIALS OR WORKMANSHIP COVERED BY THIS LIMITED WARRANTY SHALL CONSTITUTE THE OWNER'S SOLE AND EXCLUSIVE REMEDY AGAINST SEA RAY FOR ANY CLAIMS WHATSOEVER OF ECONOMIC LOSS RESULTING FROM PRODUCT FAILURE.

> A repair-and-replacement clause provides both a remedy to the
> buyer, whereby he may secure goods conforming to the contract,
> and a limitation of liability to the seller. If the repair-and-
> replacement clause as a remedy fails of its essential purpose, Minn.
> Stat. § 336.2-719(2) entails that its function as a limitation of the
> seller's liability must also fail.

Durfee v. Rod Baxter Imports, Inc., 262 N.W.2d 349, 356 (Minn. 1977) (citation

omitted).

A repair-and-replacement clause does not fail of its essential purpose, "[s]o

long as the seller repairs the goods each time a defect arises." Durfee, 262

N.W.2d at 356. "But if repairs are not successfully undertaken within a

reasonable time, the buyer may be deprived of the benefits of the exclusive

remedy." Id. (footnote omitted).

Plaintiffs have raised a genuine issue of material fact regarding whether

Sea Ray breached the Limited Warranty. Minnesota law provides that a repair or

replace warranty, such as Sea Ray's Limited Warranty, is breached when "repairs

are not successfully undertaken within a reasonable time." Smith v. Mobility

Grp., Inc., No. A07-1037, 2008 WL 2168436, at *4 (Minn. Ct. App. May 21, 2008).

"Commendable efforts alone do not relieve a seller of his obligation to repair."

Jacobs v. Rosemount Dodge-Winnebago S., 310 N.W.2d 71, 75 (Minn. 1981).

Here, the record establishes that Defendants did attempt to repair all issues

within a reasonable period of time. However, there is a fact question regarding

whether those repairs were successful. For instance, the anchor system was

inoperable in 2016, repaired, and again inoperable in 2018. (Gadtke Decl., Ex. C,

Punch List.) There was an issue with the generator that was repaired in July

2016, and then an issue with the generator that was repaired in August 2016.

(Id.) The port fuel gauge was broken and fixed in 2017 and then was broken and

fixed in 2018. (Id.) The carbon monoxide detector was malfunctioning and

repaired in 2016 and then was inoperable and repaired in 2018. (Id.) The

speedometer was malfunctioning in 2016 and then was inoperable and repaired

again in 2018. (Id.) The fact that the same problems reoccurred raises a question

regarding whether Defendants' repairs were successful. See Smith, 2008 WL

2168436, at *5 ("The record shows that the Smiths presented evidence that they

brought the van to Complete Mobility for repairs on numerous occasions – six

times according to them – and that the Smith's claim that the problems with the

van and the wheelchair lift continue. Whether or not Complete Mobility's repair

attempts were unsuccessful and, if so, whether Complete Mobility had a

reasonable amount of time to complete successful repairs, are questions of fact

that preclude summary judgment in favor of Complete Mobility on the Smiths' breach-of-warranty claim.").

"Although liability for breach of warranty attaches only when a defect existing in the goods causes a breakdown in quality, generally no specific defect need be alleged, and a defective condition can be proved by circumstantial evidence." Nelson v. Wilkins Dodge, Inc., 256 N.W.2d 472, 476 (Minn. 1977) (citation omitted). Here, Plaintiffs have presented sufficient circumstantial evidence of breach to survive summary judgment. Plaintiffs began experiencing repeated problems with the Vessel as soon as they started to use it. Sea Ray attempted to repair the various problems under its Limited Warranty "suggesting that [Defendant Sea Ray] itself acknowledged that such trouble may stem from a defect." Nelson, 256 N.W. 2d at 477. See also, e.g., Int'l Fin. Serv., Inc. v. Franz, 534 N.W.2d 261, 266 (Minn. 1995) (holding that even when there was not evidence of a specific defect which caused the problems, "the cumulative circumstantial evidence [wa]s sufficient to take the inference of causation out of the realm of speculation").

    **b)**    **Damages**

In order to survive summary judgment, Plaintiffs must raise a genuine issue of material fact regarding whether Sea Ray's alleged breach of the warranty caused them damages. Sipe v. Workhorse Custom Chassis, LLC, 572 F.3d 525, 531 (8th Cir. 2009). Here, Sea Ray expressly excluded all incidental and consequential damages in the Limited Warranty. See, e.g., Zutz v. Case Corp., No. 02-1776 (PAM/RLE), 2006 WL 463539, at *5 (D. Minn. Feb. 24, 2006) ("Parties to a contract may exclude incidental and consequential damages, but the limitations cannot be unconscionable."). Thus, the measure of Plaintiffs' damages is the difference between the value of the Vessel and what it would have been worth as warranted. See also Minn. Stat. § 336.2-714, subd. 2; Peterson v. Bendix Home Sys., Inc., 318 N.W.2d 50, 53 (Minn. 1982).

The only evidence in the record of the dollar value of the Vessel is that its estimated fair market value is $258,996, which is $12,496 more than comparable sold boats. (Finnell Decl., Ex. F, Reed Marine Survey Report at 21.)

The "owner's rule," which allows the testimony of a product's owner concerning the value of the item, does not assist Plaintiffs because Plaintiffs have offered no testimony concerning their belief about what the Vessel is actually worth. Cf. Peterson v. Bendix Home Sys., Inc., 318 N.W.2d 50, 56 (Minn. 1982)

(holding plaintiff offered sufficient evidence of damages when plaintiff testified that, in her opinion, if she tried to sell her mobile home, "I doubt if I could get $1,000.00 for it," and offered evidence that defendant "repeatedly refused to buy back [the plaintiff's] home"); State v. Frazier, No. A06-1068, 2007 WL 2769589, at *4 n.2 (Minn. Ct. App. Sept. 25, 2007) (holding there was sufficient evidence of value when "both the owner of the car and his father testified that the car's value was $1,500"); State v. Anderson, 405 N.W.2d 527, 530 (Minn. Ct. App. 1987) (holding sufficient evidence of the value of calves when "[t]he owner of the calves . . . testified that the minimum value of each calf was $400").  Here, the record contains no indication of Plaintiffs' valuation of the Vessel or their damages amount.  (See Finnell Decl., Ex. Q, P. Bollom Dep. 37 (testifying "I'm uncertain of my total damages"); Gadtke Decl., Ex. M, Plaintiffs' Answer No. 5 to Defendants' Interrogatories (averring that "Plaintiffs seek payment for loss in value of the boat due to the many problems with it and Defendants' breaches of warranty," but giving no estimate of what that loss in value is).)

"Whatever the measure of damages, the buyer must prove by credible evidence to a reasonable certainty that such damages were suffered and must prove, at least to a reasonable probability, the amount of these damages." Jacobs

v. Rosemount Dodge-Winnebago S., 310 N.W.2d 71, 78 (Minn. 1981) (citation omitted). "As a general rule, damages which are speculative, remote, or conjectural are not recoverable." Hornblower & Weeks--Hemphill Noyes v. Lazere, 222 N.W.2d 799, 803 (Minn. 1974). See also Johnson v. Anoka Cty., No. A17-0531, 2017 WL 5661580, at *6 (Minn. Ct. App. Nov. 27, 2017) ("Generally, a plaintiff has the burden of proving the existence of damages to a reasonable certainty and the amount of these damages to a reasonable probability. While damages may not be speculative, remote, or conjectural, . . . mathematical precision in proof of loss is not necessary.") (citations omitted). Plaintiffs have provided no evidence from which a jury could glean the amount of their general damages to a reasonable probability. Any calculation of a particular amount of general damages would be wholly speculative. Thus, Defendants are entitled to summary judgment. See, e.g., Alotech, Ltd. v. N. Star Imaging, Inc., No. CV 14-3414 (RHK/TNL), 2016 WL 1122024, at *9 (D. Minn. Mar. 22, 2016) (granting summary judgment on breach-of-express-warranty because "[e]ven if a warranty was created, this failure to prove damage is fatal").

### 3. Count 3: Breach of Implied Warranty of Merchantability

To establish a breach of implied warranty of merchantability claim, a plaintiff must prove: "the existence of a warranty, a breach, and a causal link between the breach and the alleged harm." Peterson v. Bendix Home Sys., Inc., 318 N.W.2d 50, 52–53 (Minn. 1982).

> An implied warranty of merchantability is defined as requiring that goods be "fit for the ordinary purposes for which such goods are used." This warranty is breached when the product is defective to a normal buyer making ordinary use of the product. Thus, even if the plaintiff has been harmed, a manufacturer may still be able to show no breach by showing that the buyer was somehow "abnormal" or that the product was not used in an ordinary way and that, consequently, the product was not defective to an ordinary user. If, however, a breach is established, the plaintiff must next prove the alleged harm was caused by the product's defect. If plaintiff's harm was caused by something other than the breach, there is no recovery.

Id. at 53 (quoting Minn. Stat. § 336.2–314(2)(c)).

#### a) MarineMax

MarineMax is entitled to summary judgment on the breach of implied warranty of merchantability claim because, as Plaintiffs concede (Opp. at 15 n.1), MarineMax disclaimed the implied warranty of merchantability in the Purchase Agreement.

**b)      Disclaimer by Sea Ray**

Sea Ray's Limited Warranty disclaimed any implied warranty of fitness or merchantability in large capital letters.  However, under the Magnuson-Moss Warranty Act ("MMWA"), asserted in Count 1, implied warranties cannot be disclaimed when a written warranty is issued to the consumer.  The MMWA provides:

> No supplier may disclaim or modify (except as provided in subsection (b)) any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product, or (2) at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product.

15 U.S.C. § 2308(a).  Subsection b permits the supplier to limit the duration of an implied warranty.  15 U.S.C. § 2308(b).  Thus, if "the plaintiffs are consumers and [the defendant] supplied a written warranty, the Magnuson-Moss Warranty Act prevents [the defendant] from disclaiming any implied warranty."  Gross v. Shep Brown's Boat Basin, No. CIV. 99-140-B, 2000 WL 1480373, at *1 (D.N.H. Feb. 28, 2000).  Based on the MMWA, Sea Ray's disclaimer of the implied warranty of merchantability is ineffective.

**c)      Damages**

As explained with regard to Count 2, in order to survive summary judgment on a breach of warranty claim, Plaintiffs must raise a genuine issue of material fact regarding whether Sea Ray's alleged breach of the warranty caused them damages. Here, the measure of Plaintiffs' damages is the difference between the value of the Vessel and what it would have been worth as warranted. (See Limited Warranty at 2 (excluding, with regard to implied warranties, consequential damages and damages for loss of use of the Vessel, loss of time, inconvenience, and commercial loss).). As explained with regard to Count 2, Plaintiffs have provided no evidence from which a jury could glean the amount of their general damages to a reasonable probability. Any calculation of a particular amount of general damages would be wholly speculative. Thus, Sea Ray is entitled to summary judgment on Count 3.

### 4. Count 1: Magnusson-Moss Warranty Act

#### a) Overview of the Magnuson-Moss Warranty Act

Section § 2304 of the MMWA

imposes certain minimum requirements on a warrantor of consumer products, including requirements that a warrantor remedy defects in its product within a reasonable time and without charge, and that a consumer be allowed to elect either a refund or replacement of the product after a reasonable number of attempts to remedy the defects.

Sipe v. Fleetwood Motor Homes of Penn., Inc., 574 F. Supp. 2d 1019, 1024 (D. Minn. 2008) (citing 15 U.S.C. § 2304), aff'd sub nom. Sipe v. Workhorse Custom Chassis, LLC, 572 F.3d 525 (8th Cir. 2009). "[T]he substantive terms of § 2304(a) apply only to full warranties." Sipe, 574 F. Supp. 2d at 1024 (citing, e.g., Schimmer v. Jaguar Cars, Inc., 384 F.3d 402, 405 (7th Cir. 2004)). See also Smith v. Mobility Grp., Inc., No. A07-1037, 2008 WL 2168436, at *2 (Minn. Ct. App. May 21, 2008) ("[L]imited warranties are not subject to section 2304, and, thus, the substantive remedies provided for in that section, which include a full refund of the purchase price, are not available for a breach of a limited warranty.") (citations omitted). Here, MarineMax disclaimed all warranties and Sea Ray's Limited Warranty is entitled "Sport Cruiser Limited Warranty" in large bold-faced font and the term "Limited Warranty" is used throughout the document. Thus, § 2304 does not apply against either Defendant.

Under § 2310 of the MMWA, "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and any other legal or equitable relief." 15 U.S.C. § 2310(d)(1). If the consumer prevails, he or she may recover attorneys'

fees.  Id. §2310(d)(2).  The MMWA creates "an independent cause of action for breach of a limited warranty."  Smith, 2008 WL 2168436, at *4.  See also Sipe v. Workhorse Custom Chassis, LLC, 572 F.3d 525, 530 (8th Cir. 2009) ("The MMWA grants the holder of a limited warranty a federal cause of action for a breach of warranty under the applicable state law.  See 15 U.S.C. § 2310(d).").  The Court looks to state breach of warranty law to determine whether the MMWA was violated through a breach of warranty.  Id.

### b)     MMWA Claim Against MarineMax

Under § 2310 of the MMWA, "only the warrantor actually making a written affirmation of fact, promise, or undertaking shall be deemed to have created a written warranty, and any rights arising thereunder may be enforced under this section only against such warrantor and no other person."  15 U.S.C. § 2310(f).  Plaintiffs concede that MarineMax effectively disclaimed any implied warranties.  It is uncontested that Plaintiffs received no express warranty from MarineMax.  Because Plaintiffs only assert a breach of express warranty claim against Sea Ray, they lack the necessary predicate claim to sustain a MMWA claim against MarineMax.  See Browe v. Evenflo Co., No. CIV. 14-4690 ADM/JJK, 2015 WL 3915868, at *5 (D. Minn. June 25, 2015) ("Without a warranty claim

arising under state law for foundation, [the plaintiff's] MMWA claim fails");

McNamara v. Nomeco Bldg. Specialties, Inc., 26 F. Supp. 2d 1168, 1175 (D. Minn.

1998) ("[W]e conclude that a party may not bring an implied warranty claim

under Magnuson–Moss, in the absence of an adjoining written warranty. . . .").

Thus, Plaintiffs cannot assert a viable MMWA claim against MarineMax.

### c) Viability of Breach of Warranty Claims

Because § 2310 applies to limited warranties, this section of the MMWA

applies against Sea Ray for failure to timely conform the Vessel to the applicable

limited warranty. However, a viable MMWA claim requires that the plaintiff

first establishes a viable breach of warranty claim. See In re Polaris Mktg., Sales

Practices, & Prod. Liab. Litig., 364 F. Supp. 3d 976, 985 (D. Minn. 2019)

(dismissing claim under MMWA because without "an underlying state-law

breach-of-warranty claim" plaintiffs cannot sustain a claim under the MMWA)

(citation omitted). Because Plaintiffs' breach of warranty claims fail, their

MMWA claims fail as a matter of law. See, e.g., Temple v. Fleetwood

Enterprises, Inc., 133 F. Appx. 254, 268 (6th Cir. 2005) ("Ultimately, the

applicability of the Magnuson–Moss Act is directly dependent upon a

sustainable claim for breach of warranty. Thus, if there exists no actionable

warranty claim, there can be no violation of the Magnuson–Moss Act.") (citations

omitted).  Defendants are entitled to summary judgment on Count 1.

### 5. Count 4: Revocation of Acceptance

#### a) Elements of a Revocation of Acceptance

The following is required for an effective revocation of acceptance under

Minnesota law:

> 1. That the goods must be nonconforming. That is they are not in
> accordance with the obligation under the contract.
> 2. The nonconformity must substantially impair the value of the
> goods to the buyer.
> 3. The buyer must have accepted the goods on the reasonable
> assumption that the nonconformity would be cured.
> 4. The nonconformity must not have been reasonably and
> seasonably cured.
> 5. The buyer must notify the seller of his revocation.
> 6. Revocation must occur within a reasonable time after the buyer
> discovers or should have discovered the ground for it and before
> any substantial change in condition of the goods which is not caused
> by their own defects.
> 7. The buyer must take reasonable care of the goods for which he has
> revoked acceptance.

Holland v. Dick Youngberg Chevrolet-Buick, Inc., 348 N.W.2d 770, 773 (Minn.

Ct. App. 1984).  See also Minn. Stat. § 336.2–608.

> The Minnesota U.C.C. requires the buyer to revoke the contract in an
> unequivocal and timely manner.  Further, upon notice of revocation,
> the buyer must not indulge in any action which would indicate that
> he has reaccepted the goods.

Barry & Sewall Indus. Supply Co. v. Metal-Prep of Houston, Inc., 912 F.2d 252, 257 (8th Cir. 1990).

### b) Substantial Impairment of Value

A buyer may revoke acceptance of goods if a nonconformity "substantially impairs" the value of the goods. Barry & Sewall Indus. Supply Co., 912 F.2d at 256. In addressing substantial impairment with respect to an automobile, the Minnesota Supreme Court has explained:

> Minor defects not substantially interfering with the automobile's operation or with the comfort and security it affords passengers do not constitute grounds for revocation. On the other hand, if the defect substantially interferes with operation of the vehicle or a purpose for which it was purchased, a court may find grounds for revocation. Indeed, substantial impairment has been found even where the defect is curable, if it shakes the faith of the purchase in the automobile.

Durfee v. Rod Baxter Imports, Inc., 262 N.W.2d 349, 354 (Minn. 1977) (footnotes omitted).

Plaintiffs have submitted evidence that they experienced repeated problems that affected the operation of the Vessel and the purpose for which it was purchased. Moreover, substantial impairment does not mean "total impairment." Green v. BMW of N. Am., LLC, No. A11-581, 2011 WL 6306657, at

*5 (Minn. Ct. App. Dec. 19, 2011) (analyzing Minnesota's motor vehicle lemon law), rev'd on other grounds, 826 N.W.2d 530 (Minn. 2013). The Vessel exhibited both minor and major operational problems, including repeated carbon monoxide detector failures, repeated gas gauge defects, repeated speedometer malfunctions, and repeated electric anchor problems. Plaintiffs have pointed to evidence of repeated failures of components that impact the safety of operating the Vessel, such as losing power to the engine, an inoperable anchor, and speedometer malfunctions. These are the type of defects where "even where the defect is curable, [] it shakes the faith of the purchase[r] in the [Vessel]." Durfee, 262 N.W.2d at 354. Plaintiffs have offered sufficient evidence of substantial impairment.

### c)      Plaintiffs' Continued Use of the Vessel

The Court holds that Plaintiffs have raised a genuine question of material fact regarding whether their continued use of the Vessel was inconsistent with any assertion of substantial impairment or intent to revoke. As Defendants note, since July 4, 2017, when Plaintiffs assert that the Vessel lost engine and battery power, Plaintiffs have continued to use the Vessel at least 25 times for more than 200 hours, including multiple day-long excursions. (Finnell Decl., Ex. N, Vessel

Use Chart.)  The Vessel is a recreational boat, not a necessary tool for Plaintiffs'

livelihood like the tractor in <u>Johannsen v. Minnesota Valley Ford Tractor</u>

<u>Company</u>, so there can be no argument that they used the Vessel "only to

perform necessary tasks."  304 N.W.2d 654, 658 (Minn. 1981).  However,

"[a]lthough the revoking buyer's continued use of defective goods may be

wrongful under some circumstances, . . . there can be no blanket rule which

prohibits such a buyer from continuing to use the goods."  <u>Id.</u> (footnote omitted).

Here, Defendants continually attempted to fix the Vessel and repeatedly

promised that it would work; thus, Plaintiffs have a viable argument that they

continued to use the Vessel to check Defendants' repairs.  <u>See</u> <u>Jacobs v.</u>

<u>Rosemount Dodge-Winnebago S.</u>, 310 N.W.2d 71, 77 (Minn. 1981) ("The 900

miles driven in the motorhome after revocation is not inconsistent with the

necessity of checking the vehicle after repairs were made by Chevrolet.  We have

held that such use after revocation does not constitute reacceptance.").  <u>See also</u>

<u>Green</u>, 2011 WL 6306657, at *5 ("And while high mileage on a vehicle could

support a finding that a defect does not substantially impair the vehicle's use, it

does not necessarily undermine a finding that a defect does substantially impair

the vehicle's use.  The statute does not require total impairment of the vehicle's

use or value. The fact that [a user] continued to drive a vehicle that he considers

unsafe—and that others [], refuse to drive—is not determinative of substantial

impairment.") (citation omitted).

### d) Revocation within a Reasonable Time

> Revocation of acceptance must occur within a reasonable time after
> the buyer discovers or should have discovered the ground for it and
> before any substantial change in condition of the goods which is not
> caused by their own defects. It is not effective until the buyer
> notifies the seller of it.

Minn. Stat. § 336.2-608, subd. 2. "The notice of revocation must be unequivocal."

<u>Sipe</u>, 574 F. Supp. 2d at 1027.

> Since this remedy will be generally resorted to only after attempts at
> adjustment have failed, the reasonable time period should extend in
> most cases beyond the time in which notification of breach must be
> given, beyond the time for discovery of non-conformity after
> acceptance and beyond the time for rejection after tender. The
> parties may by their agreement limit the time for notification under
> this section, but the same sanctions and considerations apply to such
> agreements as are discussed in the comment on manner and effect of
> rightful rejection.

Minn. Stat. § 336.2-608, cmt. 4.

"The issue of what constitutes a reasonable time within the context of

revocation of acceptance is a jury question that depends on the facts and

circumstances of the case." <u>Johannsen v. Minnesota Valley Ford Tractor Co.</u>, 304

N.W.2d 654, 657 (Minn. 1981). Revocation up to 14 months after delivery has

been upheld as reasonable by the Minnesota Supreme Court. See Jacobs, 310

N.W.2d at 76 (Minn. 1981) (affirming jury finding that revocation 12 months after

delivery was reasonable and citing with approval case allowing "revocation 14

months after initial delivery where the dealer had attempted, unsuccessfully, to

repair the major defects in the vehicle").

The Court finds that there is a genuine question of material fact regarding

whether Plaintiffs revoked within a reasonable time. Plaintiffs attempted to

revoke, albeit not unequivocally in July and August 2016, and then emphatically

in July 2017. Given Defendants' constant attempts at repairs and extension of the

warranty by one year, it is a question for the jury whether Plaintiffs

unequivocally revoked within a reasonable period of time.

### e) Disclaimer by MarineMax

The Purchase Agreement between MarineMax and Plaintiffs stated:

2. DISCLAIMER OF WARRANTIES: THE BOAT, MOTOR AND
ACCESSORIES BEING PURCHASED PURSUANT TO THIS
AGREEMENT ARE SOLD BY SELLER "AS IS" AND SELLER
MAKES NO WARRANTIES ON ITS OWN BEHALF, EXPRESS OR
IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF
MERCHANTABILITY AND FITNESS FOR A PARTICULAR
PURPOSE, *unless* Seller gives Buyer a written warranty on its own

behalf or Seller enters into a service contract in connection with this
sale or within 90 days of sale.

"[U]nless the circumstances indicate otherwise, all implied warranties are

excluded by expressions like 'as is,' "with all faults" or other language which in

common understanding calls the buyer's attention to the exclusion of warranties

and makes plain that there is no implied warranty."  Minn. Stat. § 336.2-316,

subd. 3.  See also Knotts v. Nissan N. Am., Inc., 346 F. Supp. 3d 1310, 1321–22 (D.

Minn. 2018) ("Under Minnesota law, a written implied warranty of

merchantability may be excluded or modified by using language that mentions

merchantability and is conspicuous").

Here, MarineMax clearly, conspicuously informed Plaintiffs that the sale

was "as is" and that MarineMax made no warranties express or implied.  This

disclaimer appeared twice in a two-page purchase agreement in capital letters.

Plaintiffs concede that MarineMax effectively disclaimed the implied warranty of

merchantability.  (Opp. Brief at 15 n.1.)  Cf. Blankenship v. Northtown Ford, Inc.,

420 N.E.2d 167, 170-71 (Ill. Ct. App. 1981) (holding that "[t]he dealer did not

properly disclaim the warranty [of merchantability]" and affirming decision that

revocation of acceptance was proper remedy when dealer sold "an automobile

which was unfit for the ordinary purposes for which such vehicles are used").

Plaintiffs do not allege that MarineMax gave them an express warranty on its own behalf. "Goods conform to the contract when they are in accordance with the obligations under the contract." <u>Durfee</u>, 262 N.W.2d at 353 n.3. <u>See also</u> Minn. Stat. § 336.2-106, subd. 2 ("Goods or conduct including any part of a performance are "conforming" or conform to the contract when they are in accordance with the obligations under the contract.").

Thus, MarineMax's only obligation under the Purchase Agreement was to sell Plaintiffs a new 2015 Sea Ray Venture 370. There is no argument that the Vessel was not a 2015 Sea Ray Venture 370 or that it was used. Therefore, MarineMax fulfilled its obligation under the Purchase Agreement, and there is no basis to revoke. <u>See</u> <u>Goodlow v. Winnebago Indus., Inc.</u>, No. CX-89-1300, 1989 WL 151871, at *1 (Minn. Ct. App. Dec. 19, 1989) ("In this case, the parties' purchase agreement did not obligate [the defendant] to provide a defect-free vehicle. The [plaintiffs] failed to show any nonconformity. They are not entitled to revocation.").

### f) Lack of Privity with Sea Ray

Defendants argue that Plaintiffs cannot revoke acceptance from Sea Ray because Plaintiffs purchased the Vessel from MarineMax, not from Sea Ray, thus,

they are not in direct privity.  <u>See</u> Minn. Stat. § 336.2-608, subd. 2 ("[Revocation]

is not effective until the buyer notifies **the seller** of it.") (emphasis added); <u>Smith</u>

<u>v. Mobility Grp., Inc.</u>, No. A07-1037, 2008 WL 2168436, at *7 (Minn. Ct. App. May

21, 2008) (affirming summary judgment for defendant on revocation claim

because plaintiff failed to establish privity between themselves and the

defendant manufacturer).

"Minnesota law does not categorically exclude nonsellers from liability for

revocation of acceptance claims."  <u>Highway Sales, Inc v. Blue Bird Corp.</u>, No. CV

05-1652 (DSD/SRN), 2006 WL 8439402, at *6 (D. Minn. Mar. 31, 2006).  <u>See also</u>

<u>Windsor Craft Sales, LLC v. VICEM Yat Sanayi</u>, No. CIV. 10-297 ADM/JJG, 2012

WL 3776462, at *2 (D. Minn. Aug. 30, 2012) (explaining that "Minnesota law

permits a buyer to recover against a manufacturer" and explaining that, in

<u>Durfee</u>, the court found that even where the purchaser had "'no direct

contractual relationship' with the distributor, 'the buyer [was] entitled to look to

the warrantor for relief'" and concluded that "'[t]he lack of privity between the

parties does not relieve [the distributor] of liability'") (quoting <u>Durfee v. Rod</u>

<u>Baxter Imports, Inc.</u>, 262 N.W.2d 349, 357–58 (Minn. 1977).

In <u>Durfee v. Rod Baxter Imports, Inc.</u>, the Minnesota Supreme Court held that even though the purchaser had "no direct contractual relationship" with the distributor, "[w]hen the exclusive remedy found in the warranty fails of its essential purpose and when the remaining defects are substantial enough to justify revocation of acceptance, we think the buyer is entitled to look to the warrantor for relief."  262 N.W.2d 349, 357 (Minn. 1977).  In <u>Durfee</u>, the Supreme Court reasoned that "liberal administration does not envision forcing a consumer to keep a car which is sufficiently defective so as to justify his returning it and then requiring him to sue the distributor for damages merely because the dealer is insolvent or no longer in business."  <u>Id.</u>  The court reasoned, "The existence and comprehensiveness of a warranty undoubtedly are significant factors in a consumer's decision to purchase a particular automobile."  <u>Id.</u>

Some courts have interpreted <u>Durfee</u> to hold that privity is not required only when the dealer is insolvent or no longer in business.  <u>See, e.g.</u>, <u>Smith v. Mobility Grp., Inc.</u>, 2008 WL 2168436, at *7 (holding that <u>Durfee</u> exception to the rule that privity of contract is required to seek revocation of acceptance applies only if seller "is in fact insolvent or has gone out of business").  Here, there is no allegation that MarineMax is insolvent or will cease operations.

42

Other courts have held that <u>Durfee</u> was not limited to the specific facts of the case, and, instead, stands for the proposition that privity is not required for revocation under Minnesota law when an express warranty is involved.  <u>See, e.g.</u>, <u>Highway Sales, Inc. v. Blue Bird Corp.</u>, 504 F. Supp. 2d 630, 644 (D. Minn. 2007) (noting that although, "even under Minnesota law, it is plain that a buyer may normally only revoke acceptance against a seller[;] <u>Durfee</u> created a limited exception to this rule in cases involving express warranties (and perhaps only in cases involving motor vehicles)"), <u>aff'd in part, rev'd in part</u>, 559 F.3d 782 (8th Cir. 2009).

The Court concludes that the better interpretation of <u>Durfee</u> is that Minnesota permits revocation against a nonselling manufacturer when "[t]he existence and comprehensiveness of a warranty [from the manufacturer] undoubtedly are significant factors in a consumer's decision to purchase a particular [vehicle];" "the exclusive remedy found in the warranty fails of its essential purpose and when the remaining defects are substantial enough to justify revocation of acceptance;" and recovery cannot be had against the seller, whether because that seller is insolvent or some other reason.  262 N.W.2d at 357. <u>See also</u> <u>Highway Sales, Inc v. Blue Bird Corp.</u>, No. CV 05-1652 (DSD/SRN), 2006

WL 8439402, at *4 (D. Minn. Mar. 31, 2006) (noting that, in <u>Johannsen v. Minn.</u>

<u>Valley Ford Tractor Co., Inc.</u>, 304 N.W.2d 654, 655-58 (Minn. 1981), the Minnesota

Supreme Court affirmed revocation against both the solvent dealer and the

nonselling manufacturer).  <u>See also, e.g.</u>, <u>Shuldman v. DaimlerChrysler Corp.</u>,

768 N.Y.S.2d 214, 216 (N.Y. App. Div. 2003) (citing <u>Durfee</u>, among other cases, for

the proposition that "a buyer may obtain a refund of the purchase price from a

manufacturer for breach of an express warranty, without regard to privity, under

provisions of the Uniform Commercial Code"); <u>Fode v. Capital RV Ctr., Inc.</u>, 575

N.W.2d 682, 686 (N.D. 1998) ("Under different formulations of an exception to

the general rule, however, some courts have allowed a buyer to revoke

acceptance against a non-privity manufacturer if the manufacturer has expressly

warranted goods to the ultimate buyer.") (citing, e.g., <u>Durfee.</u>, 262 N.W.2d 349).

Here, the Purchase Agreement expressly disclaimed MarineMax's

warranty and stated that the Vessel was sold "only subject to applicable

manufacturer's warranties, if any, except as otherwise expressly provided in this

Agreement."  (Purchase Agreement ¶ 1.)  <u>See</u> <u>Fode</u>, 575 N.W.2d at 687 (allowing

revocation against nonselling manufacturer when dealer's sales contract with the

plaintiff disclaimed dealer's warranty liability and "specified

'MANUFACTURER'S WARRANTY: ANY WARRANTY ON ANY NEW VEHICLE . . . IS THAT MADE BY THE MANUFACTURER ONLY'"). Sea Ray's Limited Warranty warrants that, subject to certain limitations, "the selling dealer [MarineMax] will repair or replace . . . any defects in material or workmanship in the Sea Ray Boat." (Sea Ray Limited Warranty.) See Fode, 575 N.W.2d at 687 (allowing revocation against nonselling manufacturer when manufacturer's warranty "directed the buyer to take the product to 'an authorized Coachmen dealer or service center' for warranty service").

Here, Sea Ray issued an express warranty to Plaintiffs for the Vessel, which warranted that MarineMax would repair or replace any defects in the Vessel; however, as explained with respect to Count 2, there is a genuine question of material fact regarding whether that express warranty failed in its essential purpose. There is also a genuine question of material fact regarding whether the Vessel was substantially impaired in value. Finally, Plaintiffs cannot revoke or otherwise recover against MarineMax, because MarineMax disclaimed all warranties. Therefore, the Court holds that the lack of privity between Plaintiffs and Sea Ray does not required dismissal of Count 4.

### g) Statute of Limitations

"Under Minnesota law, [] '[i]t is generally held that contracts stipulating a limited time within which an action may be brought thereon are valid unless unreasonable.'" <u>Honeywell, Inc. v. Ruby Tuesday, Inc.</u>, 43 F. Supp. 2d 1074, 1078 (D. Minn. 1999) (quoting <u>Henning Nelson Constr. Co. v. Fireman's Fund Amer. Life Ins. Co.</u>, 383 N.W.2d 645, 650 (Minn. 1986)).  Minnesota provides that the limitations period cannot be reduced to less than one year.  Minn. Stat. § 336.2-725, subd. 1.

The Limited Warranty states: "Any action for rescission or revocation against Sea Ray shall be barred unless it is commenced within one (1) year from the date of accrual of such cause of action."  Plaintiffs commenced their claim for revocation on October 5, 2018, when the Complaint was served.  This was more than one year after Plaintiffs clearly told Defendants that they wanted to return the Vessel.  (<u>See, e.g.</u>, Finnell Decl., Ex. P at P1001290, July 5, 2017 Email from Patrick Bollom to MarineMax ("We are returning the boat.  Please don't fix it for us.  We're hoping to hear from Chris in the next 24 hours what the return process is."); <u>id.</u> at P1001425, July 6, 2017 Email from Patrick Bollom to MarineMax ("We don't want to waste another summer or two fixing your boat.  Let's get this returned and get a different boat."); <u>id.</u> at P1001294-95, July 10, 2017 Email from

Patrick Bollom to MarineMax ("We're done with the boat. We have no confidence in the boat or it[]s ability to provide 2 consecutive days of safe enjoyable boating. . . . We want out of this thing.").) Defendants argue that this delay is inexcusable given that Plaintiffs have had legal counsel to address issues with the Vessel since September 5, 2017. (Id. at P1001288, P1001759; Finnell Decl., Ex. E, P. Bollom Dep. 140.)

"Under the doctrine of equitable estoppel, if a buyer delays filing suit as a result of reasonable and detrimental reliance on a seller's assurances it will repair the defective goods, the limitations period is tolled during that period of delay." Highway Sales, Inc. v. Blue Bird Corp., 559 F.3d 782, 789 (8th Cir. 2009) (footnote and citations omitted). "Estoppel depends on the facts of each case and ordinarily presents a question for the jury." Brenner v. Nordby, 306 N.W.2d 126, 127 (Minn. 1981).

The Court concludes that there are fact issues regarding whether Plaintiffs reasonably and detrimentally relied on Defendants' assurances that the Vessel would be fixed and whether Plaintiffs delayed filing suit as a result. See Mid-Continent Engineering, Inc. v. Toyoda Machinery USA, Corp., 676 F. Supp. 2d 823, 835-36 (D. Minn. 2009). Plaintiffs emailed MarineMax on July 5, 2016 and

expressed that they thought the Vessel was a lemon.  They emailed Sea Ray on August 11, 2016 and stated the same.  Defendants responded by promising more repairs under the warranty and extending the warranty period.  In 2017, Plaintiffs told MarineMax to take the Vessel back, but MarineMax responded by only offering to take the Vessel at trade, sell Plaintiffs another boat, and require Plaintiffs to keep the matter confidential.  Defendants "strung [Plaintiffs] along," constantly promising that they could fix the Vessel and "have it working." (Finnell Decl., Ex. E, P. Bollom Dep. 64-65.)  During the fall of 2017 and the spring of 2018, Plaintiffs and Defendants were still working together to try to get the Vessel repaired.  However, the Vessel experienced problems with the speedometer, electric anchor, carbon monoxide detector, GPS system, and fuel gauges during the summer of 2018.  As in Mid-Continent Engineering, numerous repairs were made on the product at issue, including repairs around the time the limitations period expired.  676 F. Supp. 2d at 835.  As in Mid-Continent Engineering, Plaintiffs have provided evidence that that the repairs that had taken place were unsuccessful.  See id. at 829, 835.  Thus, Plaintiffs have raised a genuine issue of material fact regarding whether estoppel applies, and summary judgment is denied as to Sea Ray on Count 4.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1.  Defendants' Motion for Summary Judgment [Docket No. 27] is
    **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.  Summary judgment is granted in its entirety as to Defendant
        MarineMax and all counts against MarineMax are **DISMISSED
        WITH PREJUDICE**.

    b.  Summary judgment is **GRANTED** as to Defendant Sea Ray with
        respect to Count 1: Violation of 15 U.S.C. § 2301, <u>et. seq.</u>,
        Magnuson-Moss Warranty Act; Count 2: Breach of Express
        Warranty, Violation of Minn. Stat. §§ 336.2-607 and 336.2-714;
        and Count 3: Breach of Implied Warranty of Merchantability,
        Violation of Minn. Stat. § 336.2-314, and those counts are
        **DISMISSED WITH PREJUDICE**.  Summary judgment is
        **DENIED** as to Sea Ray with respect to Count 4: Revocation of
        Acceptance, Violation of Minn. Stat. § 336.2-608.

2.  Defendants' Motion to Exclude the Testimony of Plaintiffs' Expert
    David Hallman [Docket No. 32] is **GRANTED**.

3.  Defendants' Motion to Exclude Testimony of Plaintiffs' Valuation
    Expert David Lynch [Docket No. 36] is **GRANTED**.

Dated:   April 10, 2020                   s/ Michael J. Davis
                                          Michael J. Davis
                                          United States District Court